NOT DESIGNATED FOR PUBLICATION

No. 128,607

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

TROY MITCHELL,
*Appellant/Cross-appellee*,

v.

CNH INDUSTRIAL AMERICA, LLC,
and
INDEMNITY INSURANCE COMPANY of NORTH AMERICA,
*Appellees/Cross-appellants*.


MEMORANDUM OPINION

Appeal from Workers Compensation Board. Submitted without oral argument. Opinion filed May 22, 2026. Affirmed in part, reversed in part, and remanded with directions.

*Randy S. Stalcup*, of Law Office of Randy S. Stalcup, of Wichita, for appellant/cross-appellee.

*Karl L. Wenger*, of McAnany, Van Cleave, & Phillips P.A., of Kansas City, for appellees/cross-appellants.


Before BOLTON FLEMING, P.J., ISHERWOOD and COBLE, JJ.


PER CURIAM: After being exposed to hydraulic fluid on the job and suffering from skin conditions, Troy Mitchell now appeals from the Workers Compensation Board's (Board) order, challenging the conclusion that he was not entitled to work disability compensation because his employer, Case New Holland Industrial America (CNH), terminated his employment for cause. Mitchell also challenges the Board's calculation of his impairment and work disability. CNH and Indemnity Insurance Company of North

1

America (CNH's insurer; together referenced hereinafter as "CNH"), cross-appeal the Board's impairment rating and award of future medical treatment.

On review of the record, we affirm the Board in part but reverse and remand in part. We reverse the Board's decision and remand to the Board to consider whether CNH demonstrated just cause for Mitchell's termination, finding the Board did not explain why it found CNH more credible in the record, and the evidence supporting the Board's order is inconsistent. We affirm the Board's determination of Mitchell's permanent partial impairment rating as based on two competent medical opinions and not out of the bounds of the Board's calculation. Finally, we affirm the Board's conclusion that Mitchell would require future medical treatment as supported by substantial evidence.

FACTUAL AND PROCEDURAL BACKGROUND

*Mitchell's Employment with CNH and Health Condition*

Mitchell worked on an assembly line for CNH from March 2021 through June 2023. For the first eight months of his employment, Mitchell attached hydraulic fluid lines to parts before the parts were assembled into the engines. CNH then temporarily moved him to rear fittings, where he added parts to the back of a completed skid steer unit. Up to this point in his employment, Mitchell had no skin issues.

Between March 2022 and December 2022, Mitchell was assigned to the wash or steam bay area of the plant, where he checked completed skid steer units for hydraulic fluid leaks before the bumpers were placed on the units. In the course of this work, Mitchell's skin was exposed to hydraulic fluid, causing wounds and blisters to form. Eventually, Mitchell's forehead, neck, legs and feet, torso, back, and groin were affected. Before his employment with CNH, Mitchell had never been exposed to hydraulic fluid.

As his skin condition worsened, in June 2022, Mitchell contacted CNH's human resources department and was referred to the company nurse. CNH arranged for a visit with an occupational doctor at St. Joseph Health and Environment, and the doctor diagnosed Mitchell with eczema and authorized him to return to work.

Mitchell's condition deteriorated to the point that he could not squeeze his hand to hold a tool, so he went to GraceMed in June 2022. The treating physician prescribed medication and a work restriction of no contact with hydraulic fluid. CNH placed Mitchell on Family and Medical Leave Act leave.

Also in June, Mitchell consulted a dermatologist, Sarah Johnson, APRN, at Wichita Dermatology & Aesthetics, LLC (Wichita Dermatology). According to Mitchell, Johnson provided work restrictions that prohibited his exposure to hydraulic fluid. Johnson's recollection differed. Johnson diagnosed allergic contact dermatitis associated with chemical exposure and prescribed an oral steroid plus some medicated ointment to be applied topically, but she did not impose any work restrictions.

Johnson reviewed Mitchell's condition initially every two to three weeks, but as much as six weeks between appointments, between June 2022 and December 2022. Mitchell had developed a skin infection on his ears. Johnson tried various treatments, including oral and topical steroids, but she never imposed work restrictions because she lacked knowledge about the nature of Mitchell's work. She recommended that Mitchell speak to the company nurse about work restrictions.

Mitchell claimed that Johnson promised to speak with the CNH nurse, but he never heard anything from Johnson or the nurse, and so he returned to work in the wash or steam bay area. He continued to work in the wash or steam bay area until the company shut down in December 2022 for the holidays. During the shutdown, Mitchell's condition improved.

In January 2023, when Mitchell returned to work, CNH posted him to a new position—assembling the rear doors of the skid steer units—where he was not exposed to hydraulic fluid. Mitchell did not experience any new skin conditions while working in the rear-door area. He remained in that position until late March or early April 2023, when CNH moved him to the ROPS line.

Although the parts Mitchell was assembling on the ROPS line did not involve hydraulic fluid, the carts in which the parts were brought to the line ran through hydraulic fluid and caused the fluid to pool on the floor. Consequently, Mitchell was again exposed to hydraulic fluid in this position. Although Mitchell testified that he complained about his renewed exposure, CNH left him on the ROPS line until the end of May. Valerie Hammond, the human resources manager for CNH, claimed that Mitchell told her that he did not complain to his supervisors about the exposure to hydraulic fluid while on the ROPS line because he did not want to get other employees in trouble and be labeled a "snitch."

In early May 2023, after his re-exposure to the hydraulic fluid, Mitchell returned to Wichita Dermatology. Because Mitchell had developed a rash that was getting worse, Johnson prescribed an antibiotic in addition to steroid treatments. At this time, Johnson contacted the CNH nurse about ways to prevent Mitchell's exposure to what was triggering his dermatitis. She also suggested further testing to isolate the cause of the dermatitis.

At the end of May, CNH moved Mitchell back to the rear-door position. Again, he was not exposed to hydraulic fluid in this position. While working in this location, Mitchell claimed that doors he had assembled were pulled from the line, which made him fall behind on the production quotas. He claimed he requested help from his supervisors, but they ignored his requests. Mitchell's frustration boiled over when he believed he was being ignored yet the supervisor responded to a request for help by another employee,

4

and Mitchell engaged in a verbal altercation with one of his supervisors, in which he directed profanity toward his supervisor.

One of his supervisors filed a disciplinary complaint against Mitchell on May 24, 2023, alleging insubordination and unprofessional conduct. The supervisor alleged that the conduct had occurred before but provided no specifics. CNH suspended Mitchell on June 8 or 9, pending an investigation. During the investigation, Hammond collected statements from witnesses to the interactions and prepared a written summary.

According to Hammond's investigation, Mitchell had an altercation with his supervisors on May 30, alleging that they had been hiding behind hardware racks watching him and that he directed profanities at them. Mitchell had another altercation on June 2, in which another supervisor believed Mitchell was looking at him in a threatening manner. When the supervisor confronted Mitchell about it, Mitchell responded that he could look at whoever he wanted to. According to this supervisor, Mitchell then stepped towards him, saying, "'I was waiting for [you] to make a move.'" When the supervisor ordered him to back up, Mitchell refused. Then Mitchell allegedly began ranting about not being allowed to work overtime on Saturdays. Although the supervisor did not note any racial slurs by Mitchell, another employee reported that Mitchell called after his supervisor, "'Yeah walk away you weird ass nigga.'"

The same supervisor who filed the initial complaint filed another complaint against Mitchell on June 9, complaining that management was not doing anything. It is unclear whether the supervisor was reporting an incident that occurred on June 9 or an earlier incident. Hammond's report appears to indicate that Mitchell had been suspended before the supervisor made this complaint.

While suspended, Mitchell spoke with CNH human resource representatives on the phone on June 13. At the end of the conversation, Mitchell's employment with CNH

was terminated. According to Mitchell, he was not provided with a reason for the termination. Mitchell also testified that he received no prior notice from CNH regarding concerns with his job performance or conduct. Hammond confirmed that CNH did not provide Mitchell with notice regarding his misconduct before the telephone conversation during which his employment was terminated. The written notice of termination does not contain information indicating that Mitchell received any verbal or written warnings, the date on which the notice was issued, or if Mitchell ever received a copy.

Early in his employment with CNH, Mitchell had received notice of attendance issues, which he resolved. Later, Mitchell received a write-up for failing to check the numbers on the rear fittings, a performance issue he again allegedly corrected. He also received notice of a disciplinary complaint for failing to stage doors for the next shift. Mitchell claimed that he disputed this complaint and provided video evidence that the shift prior to his had not left doors staged for him. According to Mitchell, his supervisors said that they would let the matter drop. Otherwise, Mitchell claimed he was not notified of any job-related issues.

After Mitchell left CNH's employment, he continued to suffer from symptoms related to his exposure to hydraulic fluid while still at CNH. Mitchell claimed that his symptoms were so severe that he did not seek to find alternative employment, instead living off his savings. He eventually sought treatment at the emergency room in August and October 2023, and although his condition was worse in August, the treatments he received in October left his skin condition much as it appeared at the hearing before the administrative law judge (ALJ) in April 2024. Mitchell admitted that he had not used medicated ointment since he completed the prescriptions he received in November 2023. He testified that he had needed the medication but did not want to be "going [to the ER] just to go," so he had not taken prescriptions since then. But because he had no recent exposure, the over-the-counter creams kept his skin from drying out. He must buy the creams every two weeks.

6

Mitchell applied for unemployment benefits, but the Kansas Department of Labor denied his application reasoning that his involuntary termination from employment was the result of job misconduct. In his response, Mitchell apparently acknowledged that his employment had been terminated for misconduct.

*Workers Compensation Proceedings*

Mitchell filed an application for workers compensation on January 16, 2023, alleging a repetitive workplace trauma.

At the request of his counsel, Mitchell visited Dr. Daniel D. Zimmerman for an independent medical examination on May 4, 2023. In addition to examining Mitchell, Dr. Zimmerman reviewed Mitchell's medical records from Wichita Dermatology. Dr. Zimmerman noted lichenified hypertrophy, or thickened, raised or hardened skin, on Mitchell's neck, arms, forehead, and groin. See "lichenification," Merriam-Webster Online Dictionary. Dr. Zimmerman concluded that the prevailing factor of Mitchell's dermatitis was exposure during employment to hydraulic fluid. Dr. Zimmerman assessed a whole body impairment of 19 percent from Class 2 of the Sixth Edition of the American Medical Association (AMA) Guides. Based on the severity of the skin condition, Dr. Zimmerman deviated from the AMA Guides slightly to assess a 20 percent impairment because he believed that Mitchell would suffer from the condition for the remainder of his life.

Dr. Zimmerman imposed work restrictions for Mitchell in the form of protective clothing and avoiding exposure to hydraulic fluid. Dr. Zimmerman also reviewed vocational consultant Paul Hardin's job-task assessment and calculated that Mitchell had suffered a 32 percent task loss because of his dermatitis. Dr. Zimmerman opined that Mitchell would probably not need additional medical treatment if he was not exposed to

hydraulic fluid in the future but would likely have to continue the use of emollients for the foreseeable future. Dr. Zimmerman agreed that, if the court concluded that Mitchell no longer required medical treatment, Mitchell would fall into Class 0 with no impairment. But Dr. Zimmerman refused to classify Mitchell as having no impairment without reevaluating him to determine whether his condition was completely resolved. If Mitchell fell into Class 1, Dr. Zimmerman would assess Mitchell with something between a 1 and 9 percent impairment rating. Dr. Zimmerman agreed that Mitchell could continue working at CNH if he could avoid hydraulic fluid. Dr. Zimmerman presumed that building heavy equipment would expose Mitchell to hydraulic fluid but, if not, it would reduce the number of tasks he could not perform, lessening the overall task loss assessed from 32 percent to 28.5 percent.

Mitchell's attorney also arranged for Mitchell to have a telephone interview with Hardin, the vocational consultant, regarding task loss and wage loss assessments. Based on the information Mitchell provided, Hardin assessed a 32 percent task loss, though Hardin would adjust his assessment to 36 percent if duplicate tasks were eliminated from the assessment. Using Mitchell's end salary at CNH, Hardin assessed a pre-injury wage of $1,436.89 per week. Hardin calculated that, with his condition, Mitchell would be capable of earning $878.40 per week, a wage loss of 39 percent.

At the request of CNH, Dr. James Zarr also conducted an independent medical examination of Mitchell on August 16, 2023. Dr. Zarr diagnosed Mitchell with diffuse contact dermatitis caused by chemical exposure at work. Dr. Zarr concluded that Mitchell suffered a 19 percent whole-body impairment. At the time of the August examination, Mitchell still had open sores and was still being treated. When Dr. Zarr reexamined Mitchell on January 30, 2024, Mitchell's condition had improved. Dr. Zarr concluded that Mitchell's condition no longer constituted a Class 2 injury because he no longer needed medical treatment without additional exposure to hydraulic fluid. Nevertheless, Dr. Zarr believed Mitchell would continue to need intermittent treatment and placed his condition

in Class 1. Dr. Zarr therefore assessed Mitchell with a 5 percent whole body permanent impairment. Dr. Zarr also concluded, based on his review of the pertinent materials, that Mitchell had a 32.26 percent task loss.

Mitchell was also evaluated by Steve Benjamin, a vocational rehabilitation consultant, at CNH's request. Based on the evaluations of Dr. Zimmerman and Dr. Zarr, Benjamin identified 31 job tasks that Mitchell performed when employed with CNH and assessed that Mitchell could not perform 11 of those tasks based on the relevant work restrictions, arriving at a task loss of 35.5 percent. Benjamin believed that, with his education and experience, Mitchell could enter the job market and earn approximately $1,006.60 per week. Benjamin added $181.60 in employer-paid fringe benefits for a total close to $1,400 per week. Accordingly, Benjamin calculated Mitchell's wage loss at 40.9 percent. However, based on the wages a different company, Spirit Aerospace, had offered Mitchell while he worked for CNH—a figure that included overtime pay—Benjamin reduced the wage loss to 7.1 percent.

The parties submitted the case to the ALJ on April 9, 2024. The hearing was based primarily on depositions and other written evidence. Mitchell was the only witness who testified at the hearing. The ALJ issued a written award on July 24, 2024. In reaching a decision, the ALJ ruled on five issues: (1) The prevailing factor causing Mitchell's dermatitis was exposure to hydraulic fluid at CNH, (2) Mitchell's impairment rating was a 19 percent whole body permanent impairment, (3) CNH did not properly discharge Mitchell for cause and he suffered a 38.39 percent work disability, (4) Mitchell was entitled to future medical benefits, and (5) CNH was responsible for payment of Mitchell's two emergency room visits after his employment was terminated. Finding both Hardin and Benjamin credible, and finding no evidence that Mitchell could return to his former job at Spirit given recent layoffs, the ALJ found he had a 44.65 percent wage loss. The court awarded Mitchell a total permanent partial disability award of $117,418.84,

consisting of $80,436.18 of compensation paid in a lump sum and the remainder of the award, $36,982.66, paid in installments, plus related medical expenses and fees.

CNH timely requested Board review. The Board did not entertain new evidence but reviewed the written material submitted to the ALJ and considered the parties' briefed arguments. On January 10, 2025, the Board issued its written order, affirming the ALJ award in part and modifying it in part. The Board agreed with the ALJ that Mitchell had met his burden of proving he sustained compensable injuries from repetitive trauma arising out of the course of his employment with CNH. The Board modified the ALJ's functional impairment rating from 19 percent to 12.5 percent, finding both physicians' ratings had shortcomings and averaging Dr. Zimmerman's 20 percent whole-body rating and Dr. Zarr's 5 percent whole-body rating. The Board also vacated the ALJ's award for permanent partial general work disability, finding that Mitchell's employment had been terminated for cause. The Board affirmed the ALJ's findings in all other respects, including Mitchell's entitlement to future medical treatment. Because of the modifications, the Board awarded Mitchell $38,235.56.

Mitchell filed a timely petition for judicial review with this court, and CNH filed a timely cross-petition for judicial review.

Other facts will be included as necessary to address the parties' legal claims.

ANALYSIS

I.    *Scope of Judicial Review*

Under K.S.A. 44-556(a), appellate review of a Workers Compensation Board's decision is governed by the Kansas Judicial Review Act, K.S.A. 77-601 et seq. See K.S.A. 77-603(a). The scope of judicial review is limited by K.S.A. 77-621, and, in

10

relation to the issues presented in this appeal, K.S.A. 77-621(c)(7) permits a court to grant relief from the Board's factual findings only when:

> "the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act[.]"

See *Herrera-Gallegos v. H. & H Delivery Service, Inc.*, 42 Kan. App. 2d 360, 362-63, 212 P.3d 239 (2009).

K.S.A. 77-621(d) further defines the parameters of judicial review of agency factual findings:

> "For purposes of this section, 'in light of the record as a whole' means that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review."

In essence, the scope of judicial review under K.S.A. 77-621(c)(7) and (d) requires an appellate court to examine, without reweighing, whether evidence supporting a decision has been so undermined by other evidence that it is insufficient to support the Board's conclusion. *Olds-Carter v. Lakeshore Farms, Inc.*, 45 Kan. App. 2d 390, 395, 250 P.3d 825 (2011). While the Board is authorized to make different credibility

11

determinations than those made by the ALJ, the Board is required to give its reasons for disagreeing with the ALJ to aid appellate review. *Kotnour v. City of Overland Park*, 43 Kan. App. 2d 833, 837, 233 P.3d 299 (2010).

Within the scope of this limited review, we consider each of the challenges raised in Mitchell's appeal and CNH's cross-appeal. Because the second issue Mitchell raises substantially overlaps with CNH's first cross-appeal issue, those issues are consolidated, leaving three appellate issues for our analysis: (1) whether the Board correctly concluded that Mitchell's employment was terminated for cause; (2) whether the Board correctly assessed a permanent partial impairment rating of 12.5 percent of Mitchell's whole body; and (3) whether the Board erred in awarding Mitchell future medical expenses.

II. *Did the Board err in concluding that CNH met their burden to establish that Mitchell was terminated for cause?*

Mitchell's first argument is a challenge to the Board's conclusion that he was not entitled to work disability because CNH terminated his employment for cause. In part, Mitchell's appellate argument appears to ask this court to reevaluate the evidence offered to the agency.

Although K.S.A. 77-621(d) requires that we not reweigh evidence, the Board's decision on this issue clearly departed from the ALJ's decision. As noted above, the ALJ found the question of CNH's termination of Mitchell's employment for cause a close one but ultimately concluded that CNH's firing of Mitchell was not for cause. The ALJ noted that the claims of insubordination and subsequent termination did not occur until just before Mitchell was fired after months of placing Mitchell in a job where he was exposed to hydraulic fluid, worsening his condition. The ALJ noted Mitchell's "understandable frustration" at being moved back to a job in which he was exposed to the obvious irritant. Also important to the ALJ's decision was CNH's failure to reprimand Mitchell for his

12

misconduct, either through the supervisors' failure to report Mitchell's misconduct after the first instance or through management's inertia after being informed of the misconduct.

The Board reached a different conclusion, finding that Mitchell's employment had been terminated for cause. In reaching its conclusion, the Board did not controvert either of the ALJ's bases for implicitly finding that the termination for cause was pretextual. The Board specifically acknowledged that Mitchell had not been provided notice of his misconduct, noting that Mitchell had received notice of prior violations of CNH's code of conduct. The Board did not address the fact that the employment termination came shortly after CNH responded to Mitchell's complaints about being exposed to hydraulic fluid and moved him into the rear-door assembly position. More importantly, for purposes of our review, the Board clearly rejected Mitchell's testimony regarding the circumstances surrounding his misconduct in favor of Hammond's testimony. This constitutes an implicit rejection of the ALJ's credibility determinations.

Even so, despite this court's instruction in *Kotnour*, the Board did not explain its reasons for rejecting the ALJ's credibility determination in favor of CNH. See 43 Kan. App. 2d at 837 ("For this court to fairly consider an agency's position should it disagree with a hearing officer's credibility determination, an explanation of the agency's differing opinion is generally needed.").

Under K.S.A. 44-510e(a)(2)(A), an employee is entitled to compensation for wage losses occasioned by an injury. "Wage loss" is statutorily defined to exclude "[w]age loss caused by voluntary resignation or termination for cause . . . ." K.S.A. 44-510e(a)(2)(E)(i). The parameters of what constitutes a termination for cause are not addressed within the Kansas Workers Compensation Act. Accordingly, this court borrowed from employment contract law to adopt the following standard:

13

"'[Cause for discharge] is a shortcoming in performance which is detrimental to the discipline or efficiency of the employer. Incompetency or inefficiency or some other cause within the control of the employee which prohibits him from properly completing his task is also included within the definition. A discharge for cause is one which is not arbitrary or capricious, nor is it unjustified or discriminatory.'" *Morales-Chavarin v. National Beef Packing Co.*, No. 95,261, 2006 WL 2265205, at *5 (Kan. App. 2006) (quoting *Decatur County Feed Yard, Inc. v. Fahey*, 266 Kan. 999, 1007, 974 P.2d 569 [1999], quoting *Weir v. Anaconda Co.*, 773 F.2d 1073, 1080 [10th Cir. 1985]).

Our court in *Morales-Chavarin* concluded that the fundamental inquiry when determining whether an employer had good cause to terminate employment in a workers compensation case was whether the termination was reasonable under the existing circumstances. 2006 WL 2265205, at *5. These circumstances included whether the employee made a good faith effort to remain employed and whether the employer exercised good faith in terminating the employment. In considering the latter circumstance, the court should focus on whether the employer's reason for termination is a subterfuge to avoid work disability payments. 2006 WL 2265205, at *5.

Neither the ALJ nor the Board made specific findings regarding the factors set out in *Morales-Chavarin*. In this case, the employment termination was allegedly based on Mitchell's insubordination. While insubordination would fall within the judicial gloss of termination for good cause, see 2006 WL 2265205, at *5, the circumstances of this case raise questions about CNH's good-faith termination. First, the timing of the allegations of insubordination is suspicious. Mitchell was given a work slip from his doctor on May 10, 2023, which he forwarded to human resources, reporting on the worsening of his condition due to being re-exposed to hydraulic fluid. Mitchell's floor supervisor, Nate Bynum, first reported Mitchell's insubordinance to management on May 24, 2023, a date which coincided with Mitchell's return to an area of the plant where he was no longer exposed to hydraulic fluid.

14

Moreover, the allegations appear closely related in time to Mitchell's personal complaint to CNH's human resources manager that he was being exposed to hydraulic fluid on the ROPS line. Although Hammond told Mitchell that he was responsible for maintaining his work restrictions, his complaint prompted an investigation into the floor conditions. Mitchell was then moved to the rear-door line. Hammond's written summary provides conflicting narratives regarding these events. Hammond alleged that Mitchell's complaint about exposure to hydraulic fluid on the ROPS line did not occur until June 2 or 3. Hammond stated that, after this discussion, Mitchell was moved to the rear-door assembly area. But, Bynum's complaint, allegedly emailed to Hammond on May 24, clearly referenced the doors Mitchell was building on the rear-door assembly line, so Mitchell's complaint about the ROPS line must have occurred in May. Mitchell's own testimony referenced the May 10 work slip from his doctor.

On review of the record, CNH appeared dismissive of Mitchell's condition. After being notified of his condition in June 2022, CNH did not move him to an area without exposure to hydraulic fluid until January 2023. Then, CNH returned Mitchell to an area where he was exposed from March or April 2023 to May 2023, even after being notified of his condition months before. And Mitchell testified that he told his supervisors he was upset about them putting him in areas that harmed his health, but supervisor Will Hunt said he did not open the email from the nurse.

Additionally, CNH admitted that it never provided Mitchell with notice of the complaints regarding his conduct until his telephone interview on the day CNH terminated his employment. Given that CNH never warned Mitchell, this omission fails to establish that Mitchell did not exercise good-faith efforts to remain employed because he was never given the opportunity to reform his conduct to stay employed.

We find two workers compensation appeals instructive. In both *Hernandez* and *Dirshe*, the terminated employee seeking benefits had been counseled or disciplined on

15

previous occasions for the behavior which prompted their termination. *Dirshe v. Cargill Meat Solutions Corp.*, 53 Kan. App. 2d 118, 123, 382 P.3d 484 (2016); *Hernandez v. National Beef Packing Co.*, No. 117,351, 2017 WL 4081392, *1 (Kan. App. 2017) (unpublished opinion).

In *Dirshe*, the employee had been counseled and written up for not performing his job on previous occasions. Hernandez' workplace history of violations showed she was disciplined many times before her injury, and she was fired more than a year after her accident. Our court found "there was nothing about her altercation with her supervisor that related to her workplace accident." 2017 WL 4081392, *4. Here, such is not the case—Mitchell had been counseled in the past regarding other behaviors, but those past counselings demonstrate that he adjusted his behavior accordingly in order to remain employed, yet he received no such warning about the behavior which led to his termination. And his frustration with his employer's apparent disregard—at least for some time—for his workplace exposures played a part in his behaviors.

Although the Board's decision cites Mitchell's profane language and offensive racial epithet, the Board does not explain why it rejected the ALJ's implicit adoption of Mitchell's testimony regarding the circumstances in which these offensive comments were made. The ALJ found that Mitchell's conduct stemmed from his "understandable frustration." This statement implicitly accepted Mitchell's testimony regarding the circumstances of his misconduct as true. The Board glossed over this credibility determination without explaining its rejection of the ALJ's reasoning.

Even CNH's evidence regarding Mitchell's misconduct has inconsistencies. For example, an employee other than Mitchell reported the racial slur addressed to one of the supervisors, but the supervisor, who reported the same incident, failed to mention the racial slur. This suggests either that the supervisor did not hear the slur or, as Mitchell testified, he never made the slur. Mitchell did not provide a blanket denial of the

16

accusations of misconduct. He admitted to cussing at his supervisors, but he provided a defense in the context. Mitchell alleged that his supervisors also cussed at him, and claimed that they created a hostile work environment by ignoring his legitimate calls for assistance on the line.

If CNH purposely made Mitchell's employment difficult in the hope that he would quit, or to create a basis for claiming poor job performance, then Mitchell's conduct, while perhaps a violation of the employee handbook, becomes a pretense for avoiding disability payments or complying with health-related work restrictions. On balance, the ALJ appeared to conclude that Mitchell's behavior was prompted by CNH as a pretense for terminating his employment. In other words, the timing of the termination combined with the lack of notice and the circumstances surrounding the misconduct led the ALJ to conclude that CNH's termination of Mitchell's employment for cause was not made in good faith.

While the Board reached a contrary conclusion, which it is permitted to do, it failed to provide a satisfactory explanation for rejecting the ALJ's implicit credibility determinations. The ALJ heard Mitchell testify in person, even though the other testimony was submitted by deposition. The Board merely reviewed the cold record.

Though the caselaw is not particularly clear on which party bears the burden to establish the basis for termination, the language of K.S.A. 44-510e(a)(2)(E)(i) suggests that establishing that the termination of employment was for good cause and not related to the workers compensation claim rests on the employer. An employee must establish wage loss attributable to an injury; the employer then may provide an affirmative defense by establishing that the wage loss was attributable to a legitimate termination of the employee's employment, rather than the injury. See *Merrill v. Georgia Pacific*, No. 113,996, 2016 WL 3202663, at *6, 8 (Kan. App. 2016) (unpublished opinion) (leaving undisturbed the Board's placement of the burden to show good cause on employer).

17

Under this record, the Board's decision, reversing the conclusion of the ALJ, is not adequately explained. The Board did not undertake the inquiry established by this court in *Morales-Chavarin*, 2006 WL 2265205, at *5. Accordingly, we cannot now, on appeal, conduct a meaningful review of the Board's findings that support its conclusion that Mitchell is not entitled to work disability payments and cannot determine whether substantial evidence supports the Board's decision. As a result, we reverse the Board's decision that Mitchell was terminated for cause and remand this case to the Board for further findings consistent with the standard established by *Morales-Chavarin*.

III.    *Did the Board err in reducing Mitchell's impairment rating?*

Mitchell next challenges the Board's reduction of his impairment rating, claiming the evidence supports a higher award. CNH also challenges the impairment rating assessed by the Board, taking the opposite tack—that the evidence supports a lower impairment rating. CNH argues further that the evidence failed to demonstrate that Mitchell's employment was the prevailing factor in his skin condition. The arguments are addressed in reverse order.

A. *Prevailing Factor*

Mitchell has claimed, and the Board awarded him compensation for, a repetitive use injury. CNH argues that this conclusion was error because the prevailing factor of Mitchell's injuries was a preexisting condition—an allergy unique to him—that was merely triggered by exposure to hydraulic fluid at CNH.

As a preliminary matter, we question whether CNH has properly preserved the issue for review. In CNH's submission letter to the ALJ, they provided a series of stipulations. The second and third stipulation read:

18

"2.  Claimant sustained personal injury by repetitive trauma on June 21, 2022.

"3.  Claimant's personal injury by repetitive trauma arose out of and in the course of his employment."

The ALJ questioned CNH about these stipulations at the beginning of the hearing. It was at that point when CNH claimed that they were denying that his exposure at CNH was the prevailing factor of his injuries: "We just had some testimony from Dr. Zimmerman since the prehearing settlement conference, and [we] believe this was essentially a personal condition that was rendered symptomatic from the exposure to the hydraulic fluid if that makes sense."

Under K.S.A. 44-508(e), "[r]epetitive trauma" is statutorily defined as "where an injury occurs as a result of repetitive use, cumulative traumas or microtraumas. The repetitive nature of the injury must be demonstrated by diagnostic or clinical tests. The repetitive trauma must be the prevailing factor in causing the injury." Contrary to the way CNH's counsel attempted to frame the issue at the evidentiary hearing, the stipulation does not agree that Mitchell's condition was related to exposure to hydraulic fluid at work. Instead, the stipulation specifically uses the words "personal injury by repetitive trauma." CNH's attorney knew or should have known that the term "repetitive trauma" is a term of art that includes a prevailing factor. If CNH believed that the prevailing factor of his condition was not exposure to hydraulic fluid at work but a personal condition, they should not have stipulated that the personal injury was a "repetitive trauma ar[ising] out of and in the course of his employment."

Generally, a stipulation has the force and effect of a contract, and a court will not set aside the stipulation absent a showing of fraud, collusion, mistake, accident, surprise, undue influence, false representations innocently made, inadvertence or improvidence in making the stipulation, or other ground of a similar nature. *Morrison v. Hurst Drilling Co.*, 212 Kan. 706, 709, 512 P.2d 438 (1973).

19

CNH never asked the ALJ to withdraw their stipulation on any of these grounds but merely argued that additional evidence obtained since the prehearing conference altered their legal position. Under these circumstances, CNH is bound by their stipulations.

Nevertheless, even when assuming that the issue is properly before the court, we find CNH's argument that Mitchell's injuries were caused by a preexisting condition unconvincing.

Both independent medical examiners attributed Mitchell's exposure to hydraulic fluid at work as the prevailing factor in his dermatitis. When pushed on his opinion regarding the cause of Mitchell's dermatitis, Dr. Zimmerman rejected the notion that the prevailing factor was Mitchell's personal composition rather than exposure to hydraulic fluid at work. He concluded that Mitchell would never have been exposed to hydraulic fluid if he had not worked for CNH and likely never known that he was allergic to hydraulic fluid. Without detailing the basis for his opinion, Dr. Zarr—CNH's own examiner—reached a similar conclusion.

Citing two decisions by the Board, CNH argues that Mitchell bears the burden of establishing that the repetitive trauma at work was the prevailing factor of his injuries rather than an aggravation of a preexisting injury. But the two cases CNH cites are distinguishable. In both cases, the Board noted that the *examining physicians* concluded that the workplace trauma merely aggravated a preexisting condition of the claimant. See *Hamwi v. First Student Service, LLC*, 2019 WL 4926826, at *5 (Kan. Work. Comp. App. Bd. September 11, 2019) ("In other words, Claimant's symptoms, in the opinion of these doctors, were solely an aggravation and/or acceleration of a preexisting condition and therefore not a compensable injury."); *Oubre v. Dillon Companies, Inc.*, No. 1,060,356, 2012 WL 5461475, at *5 (Kan. Work. Comp. App. Bd. October 11, 2012) ("From the medical evidence in the record, it is apparent claimant had chondromalacia patellae that

20

was symptomatic from 2008 through 2010, and then was asymptomatic until the March 13, 2012, accident. However, claimant's underlying condition of chondromalacia patellae did not change. The March 3, 2012, accident made claimant's preexisting chondromalacia patellae symptomatic.").

Here, the record contains no medical evidence to suggest that Mitchell had a preexisting condition that was merely triggered or exacerbated by his exposure to hydraulic fluid at CNH. CNH presumes that an allergic reaction to a substance is a condition of that individual's physical composition rather than a developed reaction to repeated exposure to an allergic irritant. Notably, CNH provides no medical evidence to support this theory. Both medical experts who opined on causation testified that the prevailing factor for Mitchell's condition was exposure to hydraulic fluid *at Mitchell's employment*. Without additional information, we cannot conclude that, but for Mitchell's repeated exposure to hydraulic fluid at CNH, he ever would have developed the dermatitis. The Board's finding that Mitchell established that exposure to hydraulic fluid at CNH was the prevailing factor of his condition is supported by substantial evidence in the record as a whole.

B. *Impairment Rating*

As noted, both parties challenge the Board's functional impairment rating.

"The extent of permanent partial general disability shall be the percentage of functional impairment the employee sustained on account of the injury as established by competent medical evidence and . . . for injuries occurring on and after January 1, 2015, based on the sixth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein." K.S.A. 44-510e(a)(2)(B).

In *Johnson v. U.S. Food Service*, 312 Kan. 597, 603, 478 P.3d 776 (2021), the Kansas Supreme Court held that the impairment rating in the AMA Guides is

21

merely a starting point for a medical opinion. "The key fact—percentage of functional impairment—must always be proved by competent medical evidence." 312 Kan. at 603.

Here, two doctors—Dr. Zimmerman and Dr. Zarr—provided independent medical opinions about Mitchell's functional impairment. Initially, the opinions provided similar impairment ratings. Dr. Zimmerman assessed a 20 percent permanent partial whole-body impairment, concluding that his opinion deviated from the AMA Guides slightly due to the severity of Mitchell's skin condition. Zimmerman evaluated Mitchell in early May 2023 when his condition was still severe from the exposure to hydraulic fluid at work. Dr. Zimmerman believed that Mitchell would deal with the skin condition for the rest of his life. But Dr. Zimmerman conceded that Mitchell would likely not require further medication or steroid treatment if he were not exposed to hydraulic fluid but would require the use of emollients into the foreseeable future. Dr. Zimmerman also agreed that, if the ALJ concluded that Mitchell no longer needed medication, Mitchell would fall into Class 0 of the AMA Guides, which would mean no impairment rating. Dr. Zimmerman also agreed that, if the ALJ concluded that Mitchell needed periodic medical treatment, Mitchell would fall within Class 1 of the AMA Guides, which would mean an impairment rating of 1 to 9 percent.

A few months later, in August 16, 2023—two months after Mitchell's termination—CNH's examiner Dr. Zarr also assessed Mitchell to have a 19 percent impairment rating. Dr. Zarr, however, later reexamined Mitchell in January 2024 and, at that time, assessed him at Class 1 with an impairment rating of five percent because Mitchell's condition had improved. Even so, Dr. Zarr refused to place Mitchell in Class 0 because he concluded that Mitchell would require continued intermittent treatment, even if he did not require continual treatment without additional exposure to hydraulic fluid.

Johnson, Mitchell's treating nurse practitioner, did not provide an impairment rating. She also could not attribute the cause of Mitchell's dermatitis to a reasonable degree of medical certainty. But, assuming exposure to hydraulic fluid caused the dermatitis, Johnson opined that Mitchell would likely not need further medical treatment if he avoided exposure to hydraulic fluid. In her experience with dermatitis, people whose dermatitis resolves after treatment do not need additional medication absent future exposure to the allergen.

The ALJ concluded that Mitchell suffered from a 19 percent impairment. This impairment rating is consistent with the impairment rating assessed by Dr. Zimmerman and the initial rating assessed by Dr. Zarr. The ALJ acknowledged that Dr. Zarr modified his impairment rating based on Mitchell's lack of treatment, but the ALJ rejected the reduced impairment rating because Mitchell had needed additional treatment, even though he was not receiving medical treatment from his employer. The ALJ credited Mitchell's description of his condition after his employment with CNH had been terminated.

Again, the Board disagreed with the ALJ's findings, concluding that Mitchell suffered a 12.5 percent impairment from his dermatitis. To reach this conclusion, the Board relied on both Dr. Zimmerman's and Dr. Zarr's opinions by averaging the impairment ratings each provided, explaining:

> "Both ratings have shortcomings. Dr. Zimmerman arguably rated Claimant before he reached maximum medical improvement. Dr. Zimmerman did not provide an updated rating. Dr. Zarr's ratings initially appear contradictory, but Dr. Zarr's second rating was based on additional information concerning Claimant's current medical status. Claimant testified he remains symptomatic, and uses over-the-counter emollients. The Board finds Claimant's functional impairment is 12.5% of the body as a whole, which is the average of Dr. Zimmerman's 20% whole-body rating and Dr. Zarr's 5% whole-body rating."

23

The parties in this appeal contend that the Board's impairment rating is not based on expert medical opinion. Neither Dr. Zarr nor Dr. Zimmerman assessed a 12.5 percent impairment rating. Both doctors initially testified that Mitchell fell within Class 2 because Mitchell had ongoing treatment needs. But then Dr. Zarr revised his opinion based on Mitchell's improved condition during his second examination. Dr. Zarr then assessed that Mitchell fell within Class 1 because he would need only sporadic treatment. While the testimony did not discuss the range provided by a Class 2 impairment, a page from the AMA Guides attached to both doctors' deposition transcripts establishes that the impairment rating for a Class 2 injury is 11-27 percent.

Accordingly, to assess a 12.5 percent impairment, the Board had to conclude that Mitchell required ongoing treatment for his dermatitis. The Board's findings support this conclusion by crediting Mitchell's testimony that he remained symptomatic. Our court has repeatedly found that "the existence, extent, and duration of a worker's injury is a question of fact for the fact-finder, in this case the Board, and the Board "'is free to consider all of the evidence and decide for itself the percentage of disability.'" *Perez v. National Beef Packing Co*., 60 Kan. App. 2d 489, 508, 494 P.3d 268 (2021). Here, the Board did that. It considered the initial opinions submitted by both experts, along with Dr. Zarr's more recent examination that included a need for sporadic treatment, and used all three examinations to calculate an average impairment rating. The Board explained that its impairment rating was calculated by averaging Dr. Zimmerman's initial impairment rating—calculated before Mitchell reached maximum medical improvement and nearly matching Dr. Zarr's own initial rating—with Dr. Zarr's most recent rating. The Board explained why it averaged the physicians' ratings based on their separate qualified medical opinions; accordingly, we find the rating properly supported by competent medical evidence.

IV.    *Was the Board's award for future medical treatment supported by substantial evidence?*

Finally, CNH, in its cross-appeal, challenges the Board's award of future medical treatment, arguing that the evidence establishes that Mitchell did not need further medical treatment unless he were exposed to hydraulic fluid again, which would constitute a new injury for which CNH was not responsible.

According to K.S.A. 2025 Supp. 44-510h(e)(1), a presumption attaches to a claimant who has reached maximum medical improvement that the employer's obligation for medical expenses has ended. But the presumption is rebuttable with clear and convincing evidence of the need for future medical treatment. K.S.A. 2025 Supp. 44-510h(e)(3). K.S.A. 2025 Supp. 44-510h(e)(4) excludes from the definition of medical treatment any home exercise programs or over-the-counter medications.

The Board recognized that over-the-counter medication did not qualify for future medical treatment and would therefore not encompass the emollients Mitchell routinely used on his skin. Nevertheless, the Board noted that both doctors who examined Mitchell in relation to this case opined that Mitchell would need continued prescription medical treatment, in the form of corticosteroid ointments or other medical treatments related to Mitchell's thickened skin.

While Johnson concluded that Mitchell would need no further medical treatment for his condition, absent further exposure to the allergen, her prognosis was somewhat undermined by Mitchell's experience. After he stopped working for CNH, and was presumably no longer exposed to hydraulic fluid, his condition continued to cause him problems to the extent he sought medical treatment at an emergency room in August 2023 and October 2023. Because those medical records are not contained in the record, the court cannot determine the precise nature of the treatment Mitchell received. But the

25

fact that he sought medical treatment rather than simply continuing to use his emollients is some indication of continued need for medical treatment.

More importantly, the independent medical experts obtained by both parties opined that Mitchell would need further medical treatment. Dr. Zimmerman believed Mitchell would deal with the condition for the remainder of his life. When pressed about placing Mitchell in Class 0, Dr. Zarr, the Respondent's independent medical examiner, specifically rejected the notion, believing that Mitchell's condition even at his most recent exam was severe enough to require at least sporadic treatment.

The Board's conclusion that Mitchell would need future medical treatment was established by substantial evidence. While the Respondent points to evidence in the record that supports a contrary conclusion, we do not reweigh the evidence.

V.    *Conclusion*

In summary, we reverse the Board's decision that Mitchell was terminated for cause and remand this case to the Board for further findings consistent with the standard established by *Morales-Chavarin*. The remainder of the Board's decision is upheld; that is, the Board's finding that Mitchell established that exposure to hydraulic fluid at CNH was the prevailing factor of his condition is supported by substantial evidence in the record as a whole, and we find the Board's impairment rating properly supported by competent medical evidence. Additionally, the Board's conclusion that Mitchell would need future medical treatment was established by substantial evidence.

Affirmed in part, reversed in part, and remanded with directions.